# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| KAY GHORLEY, Individually and as Administrator of the Estate of Benjamin Ghorley, Deceased,<br><br>     Plaintiff,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION; BAXTER INTERNATIONAL, INC.; and DVA HEALTHCARE RENAL CARE, INC. d/b/a ROME DIALYSIS,<br><br>     Defendants. | CIVIL ACTION<br>FILE NO.:  1:17-cv-03091-TCB |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERTS DR. RONALD FISHBACH, DR. DAVID ROSS, AND MR. J.P. GINGRAS

## INTRODUCTION

Plaintiff Kay Ghorley, in her individual capacity and as the administrator of the estate of her deceased husband, Mr. Benjamin Ghorley, alleges that Mr. Ghorley's death was caused by a defective MiniCap with Povidone-Iodine Solution (the "MiniCap"), which is manufactured by BHC.  Doc. 1-2.  Mrs. Ghorley presents no evidence that Mr. Ghorley used a defective MiniCap or that his peritonitis was caused by a problem with a MiniCap; her case is entirely circumstantial.

To support her claims, Plaintiff offers three expert witnesses:  Dr. Ronald Fishbach on the issue of causation; Dr. David Ross on regulatory issues such as product labeling, manufacturing and product recalls; and Mr. J.P. Gingras on damages.  Doc. 44.  Each of Plaintiff's experts should be excluded because they fail to meet the standards set forth in Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).  All of the experts failed to consider and apply any analysis to the facts of the case, a basic tenet of Rule 702, and their opinions will not help the trier of fact to understand the evidence.  Instead, they seek to supplant the role of the jury.  Additionally, Dr. Ross fails another prong of Rule 702 because he has no relevant experience or expertise.

# **FACTUAL SUMMARY**

Mr. Ghorley had many health issues which Dr. Fishbach failed to consider in his causation opinions and Mr. Gingras failed to consider in his damages opinions. Mr. Ghorley was a long-time smoker and his medical records reflect a history of respiratory, circulatory, heart and gastrointestinal problems, including malnutrition. Exhibit C, DaVita Patient Assessment Report, pp. 6-7. He was diagnosed with end-stage renal disease (ESRD) in November 2012, which meant that he required dialysis to filter his blood because his kidneys were not functioning. Doc. 1-2, ¶ 31. Initially he was placed on hemodialysis, which is performed at a dialysis center. Exhibit D, Deposition of Plaintiff K. Ghorley ("Ghorley Dep."), 138:25-139:2. After evaluation by his nephrologist, he switched to peritoneal dialysis ("PD")[1] – a form of dialysis that he could perform at home – in 2013. *Id*. at 139:3-16.

Before performing PD at home a patient must undergo extensive training on aseptic technique and proper use of the equipment. Aseptic technique is required to minimize the risk of infection, specifically infection of the peritoneum (peritonitis)[2],

---

[1] PD requires surgical insertion of a catheter into the peritoneal cavity and the use of specialized equipment and fluids to conduct dialysis. The MiniCap is a small plastic cap with povidone iodine and a sponge. It is a single use, disposable component of the PD system. Doc. 1-2, ¶ 13.
[2] Peritonitis is a known and common risk of PD. *See* Exhibits A, B.

because the PD catheter necessarily provides direct access into the peritoneum. Absent from Dr. Fishbach's report is any analysis regarding other potential causes of Mr. Ghorley's peritonitis, such as contamination due to improper technique.

A similarly bare analysis of the facts is performed by Dr. Ross whose opinions on the product warning failed to account for the training and risk information provided to Mr. Ghorley. Mr. Ghorley was initially trained by nurses at DVA and, while he was on PD, he was seen monthly by those PD nurses for continuing training and other care. Exhibit E, Deposition of PD Nurse S. Acker-Ray ("Acker-Ray Dep."), 56:10-2, 93:3-8; Exhibit D, Ghorley Dep., 25:1-6. Prior to beginning PD and during his use of PD, he was informed of the risks and benefits of PD, including the risk of peritonitis and death, and he signed two consent forms – one in 2013 and one in 2014 – acknowledging that he understood and accepted the risks. *See* Exhibits A, B.

While on PD, Mr. Ghorley was diagnosed with peritonitis twice – in August 2014 and in October 2014. Exhibit E, Acker-Ray Dep., 39:20-22; Exhibit F, Physician Patient Notes, pp. 17; Exhibit G, Redmond Discharge Summary, p. 1. Dr. Fishbach attributes both of these events to the assumed use of a defective MiniCap because it seemed "more than coincidental," and failed to consider other contributing factors such as poor technique. Following the first PD diagnosis, Mr.

Ghorley was observed performing PD exchanges at home by one of the DVA nurses who noted that he was not using aseptic technique.  Exhibit H, Peritoneal Dialysis Home Environment Evaluation Form, p. 2.

After his second peritonitis diagnosis, the PD catheter was removed and Mr. Ghorley returned to hemodialysis in early November 2014.  Doc. 1-2 (Compl.), ¶ 44; Exhibit D, Ghorley Dep., 178:6-21; Exhibit E, Acker-Ray Dep., 85:23-86:6; Exhibit G, Redmond Discharge Summary, p. 1.  Both peritonitis events were treated with antibiotics and the symptoms of infection resolved.  Exhibit I, Deposition of Plaintiff's Expert, Dr. R. Fishbach ("Fishbach Dep."), 65:6-66:16; Doc. 52-1, Report of Defendant's Expert, Dr. C. Zurawksi ("Zurawski Report"), p. 2.  Dr. Fishbach disregards this undisputed information from treating physicians and attributes Mr. Ghorley's death in December 2014 – over a month later – to the peritonitis. According to the medical records and death certificate, Mr. Ghorley died from acute respiratory failure, aspiration pneumonia, encephalopathy, and protein malnutrition. Exhibit J, B. Ghorley Death Certificate, p. 1.  No mention of peritonitis is made in the death certificate.

Dr. Fishbach assumed that Mr. Ghorley received and used defective MiniCaps due to BHC's recall of certain lots of MiniCaps in 2015.  The recall was initiated based on an investigation and discussion with the FDA following a small number  of

customer complaints[3] regarding the sponges in some MiniCaps.  Eight (8) lots of MiniCaps were recalled and BHC thoroughly investigated and improved manufacturing processes through a corrective action and preventative action ("CAPA")[4] process, and updated the product labeling.  Only a small number of MiniCaps were affected, even in the recalled lots.  Despite this evidence and having never performed a CAPA for a medical device, Dr. Ross opines that the CAPA was not timely initiated or adequately performed.

Patients who received MiniCaps from the recalled lots received "Urgent Recall Letters" (the "Recall Letter") in January 2015 instructing them to return any unused MiniCaps and reminding patients that use of a MiniCap with a problem with the sponge *may* lead to an increased risk of peritonitis.  Exhibit K, January 2015 Letter to PD Patients.  Mrs. Ghorley received the Recall Letter after Mr. Ghorley's death and subsequently filed this lawsuit, but has developed no evidence that Mr. Ghorley actually received or used a defective MiniCap.

---

[3] In 2014 BHC received a total of 263 complaints, or 11 complaints per million MiniCaps manufactured, significantly less than 1%.  BHC manufactures approximately 24 million MiniCaps per year in the U.S.

[4] The CAPA at issue here was formally opened in 2013 due to a small number of complaints related to manufacturing facilities outside of the U.S.

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Before allowing testimony, district courts are to evaluate the above criteria and determine whether the witness is qualified as an expert and whether the opinion offered is reliable. *Kumho Tire,* 526 U.S. 137. This "gatekeeping" function is critical to ensure that an expert witness's testimony is not only relevant, but reliable. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Kumho Tire*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589 n.7). It is also critical to screen out "experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co*., 475 F.3d 1239, 1250 (11th Cir. 2007).

The Eleventh Circuit developed "a rigorous three-part inquiry" to determine the admissibility of expert testimony under Rule 702; the trial court should consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

The determination of the adequacy of an expert's knowledge, skill, experience, training, or education is not generic, it "requires the trial court to examine the credentials of the proposed expert ***in light of the subject matter of the proposed testimony***." *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002) (emphasis added). When evaluating the qualifications of a proffered expert, the Court is to "examine 'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.' The trial court must determine whether the expert's training and qualifications relate to the subject matter of the proposed testimony." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (quoting

*Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied* 513 U.S. 1111, 1155 S. Ct 902 (1995)).[5]

Even if qualified as an expert, an expert's opinion may not be admissible if it is not reliable.  While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability.  *Frazier*, 387 F.3d at 1261 (citing *Quiet Tech. DC-8, Inc., Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341-42 (11th Cir. 2003)).  Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and *Daubert* that proposed expert testimony must be based on "good grounds."  *Id.*  Specifically, when expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and

---

[5] *See also, Butler v. First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1273 (N.D. Ga. 2009) ("While the law does not require that an expert point to any particular treatise or policy to bolster his opinions, the expert must be able to explain how his background and experience allow him to offer an opinion as to the matter at hand."); *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1315 (N.D. Ga. 2006) (excluding expert who did "not specify what experiences or what standards he relied upon in making any of these determinations."); *Thomas v. Hubtex Maschinenbau GmbH & Co KG*, No. CIV A 7:06-CV-81 HL, 2008 WL 4371977, at *7 (M.D. Ga., Sept. 23, 2008) ("he asserts that his experience and formalized training informed his analysis, but he does not explain how his experience and training led to the conclusion he reaches.").

experience of [the relevant] discipline.'" *Kumho Tire Co.*, 526 U.S. at 149 (quoting *Daubert* 509 U.S. at 592). The reliability analysis[6] must focus on more than just the expert witness's conclusions. *Daubert*, 509 U.S. at 595.

Finally, and importantly, the district court must assess whether the expert testimony is helpful to the trier of fact. This analysis turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63. The Middle District of Georgia excluded Mr. Gingras applying this analysis and explained that when a matter "is obviously within the juror's common knowledge," an expert's testimony "almost by definition, can be of no assistance." *U.S. v. Thanh Quoc Hoang*, 891 F. Supp. 2d

---

[6] The advisory committee notes for Rule 702 describe additional factors that courts consider in assessing the reliability of expert testimony: "(1) Whether experts are proposing to testify about "matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. (3) Whether the expert has adequately accounted for obvious alternative explanations. (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 advisory committee's note (2000 amends.)

1355, 1360 (M.D. Ga. 2012) (excluding expert testimony from Mr. Gingras in a check fraud suit because his proposed expert opinions were not helpful to the jury). Expert opinion testimony should not be permitted when "the evaluation . . . by an expert witness might supplant a jury's independent exercise of common sense." *Id.* Pursuant to this authority and the Court's gatekeeping function, each of Plaintiff's experts' opinions should be excluded.

## DISCUSSION

### A.   The Opinions of Dr. Ronald Fishbach Are Not Based on Sufficient Facts, Are Unreliable and Will Not Assist the Jury.

Plaintiff offers Dr. Fishbach as an expert regarding Mr. Ghorley's use of the MiniCaps and the relationship to Mr. Ghorley's injuries and subsequent death.  Dr. Fishbach's opinions are based on a mere temporal relationship between the MiniCap recall and Mr. Ghorley's peritonitis, not a medical or scientific analysis.  Dr. Fishbach did not evaluate or eliminate other potential causes of Mr. Ghorley's peritonitis and performed no analysis to determine the cause of the peritonitis or death.

### 1.   Dr. Fishbach's Opinions Are Improperly Based on Factual Assumptions and Temporal Association.

Dr. Fishbach essentially supplants the role of jury with his opinions.  Based on nothing more than assumptions combined with a temporal relationship, Dr.

Fishbach concludes that it is "medically probable that Mr. Ghorley's episodes of peritonitis were due to contamination related to the defective Minicaps [sic] which allowed bacteria and yeasts to gain access to the peritoneal cavity.  It seems more than coincidental that Mr. Ghorley never had peritonitis before the time period during which he received defective Minicaps."  *See* Doc. 44-1, p. 2.  He did not analyze the medical records to rule out other causes.  Rather, because a recall letter was sent to the Ghorleys, Dr. Fishbach assumed that: (1) Mr. Ghorley received a defective MiniCap; (2) Mr. Ghorley used a defective MiniCap before contracting peritonitis; and (3) use of a defective MiniCap caused Mr. Ghorley's peritonitis.  *See* Exhibit I, Fishbach Dep., 95:1-13.  Dr. Fishbach readily admitted that there was "obviously" nothing in the record that showed these facts.  *Id.* at 86:16-22.  He acknowledged that he was not sure whether Mr. Ghorley received and used a defective MiniCap, and if Mr. Ghorley did not, then he would not be able to link Mr. Ghorley's use of the MiniCap to his peritonitis.

> **Q**:  Do you know whether any of the minicaps that were used by Mr. Ghorley had issues with the sponges?
>
> **A**:  I don't know for certain that the ones he actually used had issues. I know that there were recalls, two recalls specifically for lot numbers that were provided to him.  I don't know what his use of the defective minicaps was.  I believe there are unopened pouches with minicaps from those lots that are present that I believe Mr. Penn may have, but I don't know have not heard that there were actually defective minicaps found.

11

. . .

**A**:    Well, if he had not used defective minicaps and that can be determined to – with accuracy, then I would say – I would have trouble relating his illness to the defective minicap.

. . .

**Q**:    How about use? What evidence do you have that Mr. Ghorley used a defective minicap? Even if he received one, what evidence have you seen in the record that Mr. Ghorley used a defective minicap?

**A**:    Obviously there was no evidence that he used a defective minicap. My assumption is he received and then used because I see no reason to assume anything but that.

. . .

**Q**:    And if he had not – if you assumed that he did not use a defective minicap, your conclusion would be different, correct?

**A**:    Correct.

*Id.* at 69:4-14; 82:7-10; 86:16-22; 95:11-14. Dr. Fishbach readily also admitted that he did not see any attribution in the medical records to the MiniCap as a potential cause of Mr. Ghorley's peritonitis or death. *Id.* at 72:6-20.

The clear language of Rule 702 states that an expert's opinion must be ***based on sufficient facts and data.*** Expert opinions are properly excluded if they are "imprecise and unscientific, or [if their] factual basis is not adequately explained." *Cook ex rel. v. Estate of Tessier v. Sheriff of Monfor Cty., Fla.,* 402 F.3d 1092, 1111 (11th Cir. 2005). An expert's own assertions that the conclusions are soundly based is insufficient. The Eleventh Circuit explained in *McClain* that an expert may not veil speculation by the expert's own assurances of reliability. Citing the advisory

12

committee's note to Rule 702, the *McClain* court recognized that the trial court's "gatekeeping function requires more than simply 'taking the expert's word for it.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005).  *See also Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted).

A temporal relationship is also not sufficient to permit expert opinion on causation.  "[P]roving a temporal relationship . . . does not establish a causal relationship . . . .  [S]imply because a person takes drugs and then suffers an injury does not show causation."  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1343 (11th Cir. 2010) (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) (emphasis in original).  "This is a classic 'post hoc ergo propter hoc' fallacy which 'assumes causation from temporal sequence.  It literally means 'after that, because of this' . . . .  It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.'"  *Id*. This fallacy is exactly what is at play here.  Dr. Fishbach has unequivocally explained that his conclusions are based on assumptions and the chronology of events — which render his causation opinion unreliable under *Daubert*.

13

### 2.      Dr. Fishbach Did Not Eliminate Other Potential Causes of Mr. Ghorley's Illnesses and Death.

Dr. Fishbach recognized that a multitude of factors could have caused Mr. Ghorley's peritonitis and death, but he did not evaluate and rule out any of them. For example, Dr. Fishbach acknowledged that there is no way to eliminate the risk of peritonitis in PD patients,[7] but that he discounted other causes based on his invalid assumptions – not evidence – and the temporal relationship between the recall and Mr. Ghorley's peritonitis.

> **Q**:  And to rule out those other – to rule out other causes, you have assumed that he used a defective minicap, correct?
>
> **A**:  Based on all of the evidence I have regarding the development of peritonitis and the sending of – manufacturing and sending of defective minicaps, I make that assumption.
>
> . . .
>
> **Q**:  And you did not personally do any evaluation of the minicaps to personally determine whether they were defective, correct?
>
> **A**:  Correct.
>
> . . .
>
> **Q**:  Is it possible to get peritonitis without any problems with equipment?
>
> **A**:  Yes.

Ex. I at 95:1-7; 95:18-21; 62:17-19.

---

[7] Dr. Fishbach testified:  "I don't think it can be done in a 100 percent manner, so that basically it's impossible to totally eliminate the risk of infection in any procedure including in-hospital procedures such as surgery, home procedures.  I think there is always a potential risk."  Ex. I at 68:6-10.

Dr. Fishbach conducted no independent analysis or inquiry about other causes of peritonitis, or whether the MiniCaps that Mr. Ghorley received and used were defective, and without such information, his conclusory opinion is nothing more than speculation.  *See Magbegor v. Triplette*, 212 F. Supp. 3d 1317, 1329 (N.D. Ga. 2016) (finding medical opinion unreliable when no independent inquiry into causation was made and based on expert witness's failure to account for alternative explanations of injury at issue).  Consequently, Dr. Fishbach's opinions do not satisfy the Rule 702 or *Daubert* standards.

**B.     The Opinions of Dr. Ross Should Be Excluded Because He Is Not Qualified as an Expert in Medical Devices and His Opinions Are Unreliable.**

Dr. Ross is offered by Plaintiff to provide expert opinions regarding regulatory compliance and manufacturing, Doc. 44-2, p. 4, but he does not have any experience or specialized knowledge regarding medical devices generally or MiniCaps in particular.  By his own admissions, Dr. Ross does not qualify as an expert regarding the regulatory or manufacturing requirements applicable to medical devices; his opinions are unreliable and will not assist the trier of fact.

### 1.    Dr. Ross Is Not Qualified to Provide Opinions Regarding Medical Devices.

Dr. Ross is an infectious disease physician with no experience with medical devices.  The MiniCap is defined by the Food & Drug Administration ("FDA") as a Class II medical device. Exhibit L, FDA Clearance Letter, p. 2.  Medical devices are governed by specific sections of Food, Drug and Cosmetic Act, which regulations are implemented and enforced by the FDA's Center for Devices and Radiologic Health (CDRH).  *Id.*   Although Dr. Ross previously worked at the FDA, his regulatory experience was obtained in the FDA Center for Drug Evaluation and Research, which as the name suggests, pertains to pharmaceutical products, not medical devices.  He did not work in CDRH and is not familiar with the regulations that govern medical devices; he reviewed them for this litigation.  Dr. Ross readily acknowledged his lack of experience in deposition:

> Q.    At any point in your career with the FDA, did you work for the Center for Devices and Radiologic Health?
> A.    Not directly, **no.**
> . . .
> Q.    In your role at CDER, which is the Center for Drug Evaluation and Research, did you review and approve devices?
> A.    You mean – just to be more specific, you're talking about a 510(k) or a premarket application?
> Q.    Exactly.
> A.    **No.**
> Q.    Have you ever prepared a 510(k)?
> A.    **No.**

Q.	Have you ever prepared a PMA?

A.	**No.**

Q.	Have you ever served as the FDA reviewer for a 510(k)?

A.	**No.**

Q.	Have you ever served as an FDA reviewer for a PMA?

A.	**No.**

. . .

Q.	In your time with CDER, did you ever review a device label for approval?

A.	So, just to be clear, I would not have been a member of a review team for a – either a PMA or a 510(k), so I would not have been reviewing it for approval.  But if I did, it would be in – as providing input to CDRH.  And again, I'm not – again, this probably would be in terms of when I was, for example, deputy director of the Office of Therapeutic Biologics more than ten years ago, so I can't recall any specifics in terms of regulatory applications.

	But it would – to answer your question more concisely, **I would not have been a member of the formal review team.  I would be listed as a consultant.**

Q.	As you sit here today, do you remember even consulting on any device labels?

A.	You know, I just – **I just don't**, and the issue is not that I can't – I can remember, you know, for example, in antimicrobials in vitro devices are extremely important, antimicrobial susceptibility testing systems.  So that's something where we certainly would have back and forth with the office of – the branch and the office of device evaluation that handles those.

	**But I honestly can't remember a specific example off the top of my head.**

Q.	At any time when you worked for FDA, were you the primary reviewer of any device aspects of a label?

A.	**I don't believe so.**

. . .

Q.	Have you – in your role at the FDA, at any point in time did you review a device manufacturer's plan for recall

A.	**Not that I recall.**

Q.    Did you ever prepare a device recall plan?

A.    With the caveat that I've – have done – had done analogous sorts of tasks related to drugs such as health hazard evaluations or market withdrawals, **I'd say no.**

Q.    Have you ever participated in any capacity in a device recall?

A.    During my time at FDA, **not that I recall.**

Q.    Have you ever written a remediation plan for a device manufacturer?

A.    **No.**

Q.    Have you ever prepared a device product surveillance protocol?

A.    With the caveat that I've prepared surveillance protocols for drugs, and that's – again in some instances, those are – would cover issues involving nonconformities and things like pre- -- prefilled – products delivered by prefilled syringes.  **Not that I recall.**

Q.    But with the device specific, **you have not prepared a device product surveillance protocol.**

A.    **Correct.**

Q.    Have you ever prepared a corrective action and preventative action standard operating procedure for a device?

A.    In – I have in other domains, **but not for a device.**

Q.    Have you ever conducted a corrective action and preventative action investigation for a device?

A.    Again, with the caveat that I've done CAPAs – executed CAPAs in other domains, **not for a device.**

Exhibit M, Deposition of Dr. D. Ross ("Ross Dep."), 52:6-8; 54:13-24; 58:7-59:1-14; 60:1-61:20 (emphasis added).

Further illustrating his lack of relevant knowledge, Dr. Ross has not researched or published regarding any aspect of medical device manufacturing, complaint review or regulation.  *Id.* at 52:6-8; 54:13-20; 58:7-62:12.  Nor can he compensate for his lack of experience in medical devices with experience with PD,

18

because it is limited to only his medical school and residency training. *Id.* 82:8-13. He has never instructed a patient on the use of a MiniCap. *Id.* at 82:20-22. In other words, his credentials are not relevant to the opinions he offers in this case.

A trial court is required "to examine the credentials of the proposed expert ***in light of the subject matter of the proposed testimony***." *Jack*, 239 F. Supp. 2d at 1314-16 (emphasis added). Dr. Ross's experience and expertise falls far short in the field of medical devices. He has no practical experience or specialized training such that his opinions would assist the jury with the review of claims regarding a medical device. The law makes clear that an expert must be qualified to offer his opinions in order for them to be admissible; Dr. Ross's own deposition testimony demonstrates that he lacks the requisite training, experience, and specialized knowledge to offer his opinions in this case.

### 2. The Opinions of Dr. Ross Are Not Based on Sufficient Facts or Experience.

In addition to, and perhaps due to, his lack of experience and expertise with medical devices, Dr. Ross's opinions do not rise to a minimal threshold of reliability required by Rule 702 and *Daubert*.

Dr. Ross opines that BHC did not comply with current Good Manufacturing Practices (cGMPs) because it produced nonconforming products and did not have a

specification for the depth of the sponge in the MiniCap.  He also states that BHC's other processes were insufficient under FDA standards, including monitoring complaints and responding to signals of manufacturing/design defects.   These opinions are not supported by reliable information or analysis and will not assist the jury.  Dr. Ross did not review BHC's manufacturing procedures, specifications, quality control procedures, and was not at all familiar with the manufacturing process for the MiniCaps.  Exhibit M, Ross Dep., 146:10-147:7.  In fact, his opinion that BHC did not follow cGMP is simply based on the recall, not any expert analysis. *Id.* at 146:2-9.

Dr. Ross is also critical of BHC's investigation of the complaints, the evaluation of the health hazard presented by the nonconformance and the timing of BHC's investigation and implementation of corrective action.  Dr. Ross was not critical of the recall itself, but instead of the timing; he thought it should have been done sooner.  Notably, however, he could not articulate a threshold of complaints above which an investigation should have been triggered or at what point in time the recall should have been implemented.  *Id.* at 186:17-188:24.  He was not familiar with the frequency of, or acceptable parameters for, nonconforming products in the manufacturing and quality control process for medical devices.  *Id.* at 147:8-14.

Similarly, Dr. Ross offered no explanation for, or analysis about, how the recall should have or could have been done sooner. *Id.* at 193:5-197:8.

Moreover, Dr. Ross relies on information that is not binding on device manufacturers, that he has no experience implementing, and that he does not seem to fully understand. For example, in his original report, he cites to the drug policy manual and admits that he did not review or even know of the device manual. *Id.* at 106:21-107:11. In his untimely supplemental report, filed on October 9, 2018, criticizing BHC's CAPA, Dr. Ross relies on a document that he found while doing internet research. He had never seen it before September 2018 and did not know if FDA used it, yet he relied upon it for his supplemental opinion regarding the CAPA. *Id.* at 95:11-96:7. Dr. Ross has never evaluated or performed a device CAPA and has never used the document to evaluate or perform a CAPA. *Id*. at 61:15-20, 100:20-24.

His criticisms of the product label are similarly bare. He could cite to no facts, regulatory authority, testimony or experience that support his conclusion that the label was inadequate or "misbranded" per 21 U.S.C. § 352. Indeed, he admits that he has never reviewed a device label for approval and had not seen any information from FDA that was critical of the MiniCap label. Exhibit M, Ross Dep., 123:13-23. Dr. Ross engaged in no regulatory analysis to conclude that the label was inadequate;

his opinion appears to be based solely on the fact that BHC updated the label. Consequently, his opinion would do nothing to assist the jury, is merely *ipse dixit* and should not be admissible.

### C.     The Opinions of Mr. Gingras Will Not Assist the Trier of Fact and Are Not Based on Sufficient Facts.

Plaintiff identified Mr. J.P. Gingras, a Certified Public Accountant (CPA), to offer opinions on the economic losses allegedly sustained by Mrs. Ghorley, specifically, the loss of Mr. Ghorley's Social Security benefits and loss of household services. Doc. 44-3. His unreliable calculations of lost Social Security benefits are based on a single medical record, not a document used to verify income; his calculations of the loss of household services are unreliable, generic and not based on any evidence; and the life expectancy used by Mr. Gingras for both damages calculations is generic and not based on the facts in the case.

#### 1.     Mr. Gingras's Opinion Regarding Mr. Ghorley's Lost Social Security Benefits Is Unreliable, Misleading, and Would Not Assist the Trier of Fact.

Mr. Gingras calculates the lost Social Security income based on a medical record from November 2012 from the Atlanta VA Medical Center.[8]  *See* Exhibit N.

---

[8] The progress note, which includes an unverified reference that Mr. Ghorley receives "$1238/month from Social Security," was apparently prepared by a social

Mr. Gingras did not verify Mr. Ghorley's Social Security income from any document that an accountant would typically use to confirm income, such as a tax return or statement from the Social Security Administration.   Mr. Gingras did nothing to confirm the information nor did he consider any other source to establish Mr. Ghorley's income.   *See* Exhibit O, Deposition of Mr. Gingras ("Gingras Dep."), 58:4-59:15.   He admits that in his work as a CPA and according to the AICPA manual he cites, he would not use a reference in medical record – standing alone – to verify income.  *Id.* At 60:15-24.

> **2.    Mr. Gingras's Opinions Regarding Mr. Ghorley's Household Services Is Unreliable, Misleading, and Would Not Assist the Trier of Fact.**

Mr. Gingras's opinion of loss of household services ignores the facts of the case; his calculation is generic and prepared in order to offer the jury a tool[9] which the jury could use to calculate the amount of damages.   This misleading opinion ignores the record evidence that Mr. Ghorley did not perform *any* household duties

---

worker in the context of providing medical care, not financial planning.  Doc. 44-3, p. 14.

[9] Mr. Gingras provides a table of calculations for levels of contribution ranging from 5% to 100% from which he suggests the jury can calculate damages once it determines the percentage of Mr. Ghorley's household contribution.  The table is based on an average hourly rate of <u>all</u> hourly workers, regardless of type of work, and assumes a 24-hour work day.  *See* Doc. 44-3.

after he began hemodialysis in 2012.  *See* Ex. D, Ghorley Dep., 67:17-24; 68:13-69:23.  Nonetheless, Mr. Gingras suggests that the jury should be provided this table which he claims is "superior" but he does not know whether others use a similar methodology.  Ex. O at 106:12-24.  This manner of calculating the loss of household services is *ipse dixit*; Mr. Gingras believes that the jury should use his calculations because he says so, not because it is accepted by other accountants or economists.  His method is not based on facts and is not recognized in the AICPA manuals he relies on nor is it widely used among other financial experts.  *Id.* at 79:9-22.

### 3. Mr. Gingras's Life Expectancy Calculation Is Misleading and Will Not Assist the Trier of Fact.

Both of the opinions offered by Mr. Gingras depend on the life expectancy for Mr. Ghorley.  Here again Mr. Gingras's opinion is generic and not based on the facts of the case.  Mr. Gingras uses a general life expectancy calculator published by the National Center for Health Statistics ("Health Statistics Chart") that cites the average life expectancy of all males in the United States and does not take into account any evidence regarding Mr. Ghorley's health issues.  *See* Doc. 44-3, p. 20.  Mr. Gingras ignored the fact that Mr. Ghorley had many health problems, including ESRD, and contrary to the medical evidence, opines that Mr. Ghorley would live to a minimum of 84.13 years to a maximum of 95.93 years.  Mr. Gingras did not use, or even

consider, the life expectancy chart published by the United States Renal Data Service (USRDS) that directly addresses the much lower life expectancy of an individual with renal disease.[10]  Ex. O at 72:25-73:25.  By failing to consider the undisputable fact that Mr. Ghorley had ESRD, and as a result had a shorter than average life expectancy, and instead applying a generic, average and optimistic life expectancy that does not fit the facts of the case, is misleading and confusing to the jury.

## CONCLUSION

For the multiple, independent reasons described above, BHC respectfully requests that this Court exclude the opinions of Dr. Ronald Fishbach, Dr. David Ross, and Mr. J.P. Gingras from this litigation.

---

[10] Nor did he use the approved mortality tables found in O.C.GA. § 24-4-45, such as the Georgia Annuity Mortality Table, which provides that Mr. Ghorley would have lived to 80.71 years.

Dated:  December 7, 2018

_/s/ Suneel C. Gupta_

SUNEEL C. GUPTA
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
Georgia Bar No. 452203
Monarch Plaza, Suite 1600
3414 Peachtree Road NE
Atlanta, GA 30326
Telephone: (404) 577-6000
sgupta@bakerdonelson.com

WENDY WEST FEINSTEIN
(Admitted Pro Hac Vice)
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA 15219-6401
Telephone: (412) 560-7455
wendy.feinstein@morganlewis.com

_Attorneys for Defendant Baxter_
_Healthcare Corporation and DVA_
_Healthcare Renal Care_

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAY GHORLEY, Individually and as
Administrator of the Estate of Benjamin
Ghorley, Deceased,

     Plaintiff,

v.

BAXTER HEALTHCARE
CORPORATION; BAXTER
INTERNATIONAL, INC.; and DVA
HEALTHCARE RENAL CARE, INC.
d/b/a ROME DIALYSIS,

     Defendants.

CIVIL ACTION
FILE NO.:  1:17-cv-03091-TCB

## CERTIFICATE OF SERVICE AND COMPLIANCE WITH LR 5.1

I hereby certify that on this date I filed the foregoing Brief in Support of

Motion to Exclude Expert Opinions of Dr. Ronald Fishbach, Dr. David Ross, and

Mr. J.P. Gingras with the Court's ECF system, which will cause delivery of the

document to the following counsel of record:

     Darren W. Penn, Esq.
     Alexandra Sachi Cole, Esq.
     Penn Law, LLC
     4200 Northside Parkway N.W.
     Building One, Suite 100
     Atlanta, GA  30327

I further certify that this document complies with LR 5.1 as to font, spacing and margins.

This 7th day of December, 2018.

/s/ Suneel C. Gupta
SUNEEL C. GUPTA
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
Georgia Bar No. 452203
Monarch Plaza, Suite 1600
3414 Peachtree Road NE
Atlanta, GA 30326
Telephone: (404) 577-6000
sgupta@bakerdonelson.com

*Attorneys for Defendants*