IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAY GHORLEY, individually and
as administrator of the estate of
Benjamin Ghorley, deceased,

     Plaintiff,

v.

BAXTER HEALTHCARE
CORPORATION; BAXTER
INTERNATIONAL INC.; and
DVA HEALTHCARE RENAL
INC. d/b/a ROME DIALYSIS,

     Defendants.

CIVIL ACTION FILE

NO. 1:17-cv-3091-TCB

**O R D E R**

In November 2012, decedent Benjamin Ghorley, age sixty-seven,

was diagnosed with end-stage renal disease, or kidney failure, and

began dialysis to filter his blood. Originally, he was placed on

hemodialysis, which was performed at a dialysis center. In March 2013,

he was placed on peritoneal dialysis ("PD"), a form of at-home dialysis.

PD involves use of MiniCaps, which are plastic caps soaked with peridone-iodine solution that help keep the dialysis sanitary.

On December 11, 2014, Mr. Ghorley died. His widow, Plaintiff Kay Ghorley, individually and as administratix of his estate, alleges that Mr. Ghorley died from peritonitis after he used a defective MiniCap during the course of his dialysis.

Before beginning PD, Mr. Ghorley received training on aseptic technique and proper use of the dialysis equipment.[1] In August 2014, during a PD home environment evaluation, a nurse indicated that Mr. Ghorley had trouble connecting the machine lines to bags without touching other surfaces, thereby increasing his risk of infection.

In August 2014, Mr. Ghorley contracted and was treated for his first bout of peritonitis. In November 2014, he contracted his second bout of peritonitis. When he was discharged from the hospital following his second bout of peritonitis, he did not show any signs of infection. He died that December.

---

[1] Aseptic technique is required to reduce the risk of infection because the PD catheter provides direct access into the peritoneum.

The death certificate states that Mr. Ghorley died from acute respiratory failure, aspiration pneumonia, encephalopathy, and protein malnutrition. The death certificate does not mention peritonitis.

In January 2015, Defendant Baxter Healthcare Corporation recalled eight lots of MiniCaps following customer complaints of issues with the sponges in some MiniCaps. Not all MiniCaps in those lots were defective.[2] That month, Baxter Healthcare sent an urgent recall letter to the Ghorleys instructing Mr. Ghorley (who had already died) to return any unused MiniCaps. The recall letter warned that the use of a defective MiniCap may lead to an increased risk of peritonitis. Defendants had sent the Ghorleys MiniCaps from two of the recalled lots in the months leading up to Mr. Ghorley's death. As stated previously, Mrs. Ghorley alleges that prior to his death Mr. Ghorley received defective MiniCaps which caused his peritonitis, and in turn, his death.

---

[2] In 2014, Baxter Healthcare received a total of 263 complaints, or eleven complaints per million MiniCaps manufactured.

3

On November 17, 2016, Mrs. Ghorley brought this action in the State Court of Gwinnett County. On August 15, 2017, Defendants removed the case to this Court.

Currently before the Court is Defendants Baxter Healthcare Corporation, Baxter International Inc. (collectively, "Baxter"), and DVA Healthcare Renal Inc.'s motion [66] to exclude the opinions of Plaintiff's experts Dr. Ronald Fishbach, Dr. David Ross, and Mr. J.P. Gingras.

## I.  Legal Standard

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Although the rules provide the Court with only limited guidance, the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is instructive. "Unlike an

4

ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.* at 592 (citation omitted). Trial courts therefore act as "gatekeepers" to ensure that a proposed expert's testimony is not only relevant, but reliable. *Id.* at 589. To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).

As a gatekeeper, the trial court should conduct a "rigorous three-part inquiry" to determine whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Although there is inevitable overlap among the three prongs of this analysis, trial courts must be cautious not to conflate them, and the

proponent of expert testimony bears the burden to show that *each* requirement is met. *Id.*

*Daubert* sets forth a list of factors to be considered regarding the reliability of a proposed expert's testimony. These factors include (1) whether the expert's theory can be and has been empirically tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) the known or potential error rate of the expert's theory; and (4) whether the expert's theory is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94.

These factors bear on the Court's inquiry, but do not compose a definitive checklist. *Id.* at 593. Not every factor "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d at 1262. Thus, the trial court has considerable leeway to determine whether proffered expert testimony is reliable. *Id.*

Finally, the district court must assess whether the expert testimony will assist the trier of fact. Put another way, the Court must

ask whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Id.*

## II.    Discussion

### A.    Dr. Ronald Fishbach

Mrs. Ghorley retained Fishbach to opine as to the relationship between the MiniCaps and Mr. Ghorley's injuries and death. Fishbach, in an eight-page report, posits that "it is medically probable that Mr. Ghorley's episodes of peritonitis were due to contamination related to the defective Minicaps [which] allowed bacteria and yeasts to gain access to the peritoneal cavity." [44-1] at 2. Fishbach states that "[i]t seems more than coincidental that Mr. Ghorley never had peritonitis before the time period during which he received defective Minicaps." *Id.*

### 1.    Defendants' Arguments

Defendants do not question Fishbach's qualifications; rather, they argue that his opinions are not reliable because (1) they are improperly based on factual assumptions and a temporal relationship, and (2) they fail to eliminate other potential causes of Mr. Ghorley's illnesses and

death. Consequently, Defendants assert that his opinions will not assist the jury.

Defendants first argue that Fishbach made improper assumptions based on the fact that Baxter sent a posthumous recall letter to Mr. Ghorley. In particular, they argue that Fishbach assumed that Mr. Ghorley received and used a defective MiniCap which, in turn, caused his peritonitis. To support their assertions, Defendants cite to Fishbach's acknowledgment that he could not ascertain whether Mr. Ghorley received or used defective MiniCaps.

Defendants also argue that Fishbach did not eliminate other potential causes of Mr. Ghorley's illnesses and death. They argue that even though Fishbach recognized that multiple factors could have caused peritonitis and death, he did not evaluate or rule out any of them. Further, they argue that to the extent Fishbach did rule out other causes, such a determination was based on assumptions, not evidence.

### 2.   Plaintiff's Response

Mrs. Ghorley responds that it would be impossible for Fishbach to determine whether her husband used the defective MiniCaps because

the disposable MiniCaps are discarded after each use. She also asserts that Fishbach's opinion that the use of the MiniCaps would cause the peritonitis falls within his experience and expertise.

Mrs. Ghorley highlights the basis for Fishbach's opinion: (1) Mr. Ghorley's bouts of peritonitis correspond with his receipt of MiniCaps later recalled; (2) the MAUDE[3] database corroborates Fishbach's opinion; and (3) Fishbach considered other risk factors. She asserts that any challenges to Fishbach go to the weight and not the admissibility of his testimony.

### 3.   Analysis

It is undisputed that the defective MiniCaps could cause peritonitis. The parties dispute whether Mr. Ghorley used defective MiniCaps and if so, whether those defective MiniCaps caused his peritonitis and possibly his death.

---

[3] The Manufacturer and User Facility Device Experience database houses medical device reports submitted to the Food and Drug Administration by mandatory and voluntary reporters. *MAUDE-Manufacturer and Use Facility Device Experience*, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm. (last visited Aug. 28, 2019).

Defendants attack Fishbach's assumption that Mr. Ghorley used defective MiniCaps. That alone is not fatal to Fishbach's testimony. It would be impossible for Fishbach to determine whether Mr. Ghorley used defective MiniCaps, as those MiniCaps were intended for one-time use and have long since been discarded.

More important is whether Fishbach's opinion that the defective MiniCaps caused Mr. Ghorley's peritonitis is reliable. It is not. The focus of a *Daubert* challenge "must be solely on principles and methodology . . . ." *Daubert*, 509 U.S. at 595. The problem with Fishbach's opinion is that he identifies *no* principles or methodology. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (quoting Advisory Committee's 2000 Notes on FED. R. EVID. 702).

In general, there are factors that courts should consider when determining the reliability of an expert's testimony. These factors include, inter alia, whether a theory or technique has been tested and subjected to peer review, whether a technique has a high known

potential rate of error, and whether a theory or technique enjoys general acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 593–94. The Court is unable to apply any of these factors because Fishbach fails to identify any theory or technique used to form his opinion.

Fishbach's review of medical records, MiniCap order history, and the MAUDE database are not sufficient to make his opinion reliable given his inability to articulate how the review of those documents led to the determination that the MiniCaps caused Mr. Ghorley's peritonitis. *See* Advisory Committee's 2000 Notes on FED. R. EVID. 702 ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

Mrs. Ghorley asserts that the MAUDE database supports Fishbach's opinion; however, that argument is unavailing because Fishbach testified that he did not rely on the MAUDE database to formulate his opinion.

11

Further, it seems that Fishbach's opinion is based on a temporal relationship. Fishbach opines that because Mr. Ghorley contracted peritonitis around the time he receives defective MiniCaps, the MiniCaps caused the condition.

In *McClain*, 401 F.3d at 1243, the Eleventh Circuit held that "proving a *temporal* relationship . . . does not establish a *causal* relationship." In that case, the plaintiffs took a weight-loss drug and suffered from conditions such as strokes and heart attacks. The court held that simply showing that a person took the drug and suffered an injury does not show causation.[4] Similarly here, just because Mr. Ghorley used MiniCaps from the defective lots does not mean that that use caused his peritonitis and subsequent death.

Defendants also criticize Fishbach's failure to exclude other causes of the peritonitis. Had this been a case in which Mr. Ghorley suffered from no other health problems, this failure might not matter. However, the reality is that Mr. Ghorley was an ill man; he had end-stage renal

---

[4] In *McClain*, the Eleventh Circuit reversed the trial court's admission of the expert testimony for many reasons, including the expert's reliance on a temporal relationship.

12

disease. Fishbach failed to consider any other causes of his peritonitis, including user error, i.e., failure to maintain aseptic technique. Fishback also failed to consider any other causes of Mr. Ghorley's subsequent death. This failure is significant considering that Mr. Ghorley did not show any signs of infection when he was discharged from the hospital following his second bout of peritonitis. Moreover, the death certificate does not mention peritonitis at all. Instead, Fishbach states that he relied on his "clinical judgment" to determine the cause of the infection. [66-10] at 23.

Fishbach's failure to consider alternative causes of Mr. Ghorley's peritonitis makes his testimony unreliable. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296 (11th Cir. 2014) (affirming district court's decision to exclude an expert for failure to rule out possible alternative causes of the plaintiff's disease when numerous other potential causes existed).

Accordingly, the Court will exclude Fishbach's testimony.

**B.     Dr. David Ross**

Mrs. Ghorley hired Ross to opine on (1) the regulatory adequacy of product labeling for the MiniCaps; (2) compliance by Baxter with respect to the current Good Manufacturing Practices (cGMPs) and other applicable Food and Drug Administration standards regarding the MiniCaps; (3) the regulatory adequacy of Baxter's inclusion of manufacturing and design standards relating to the depth of the sponge; and (4) the regulatory adequacy of Baxter's notification procedures to the FDA.

Defendants seek to exclude Ross's opinions on the basis that he is not qualified as an expert in medical devices, and his opinions are unreliable.

Ross has an impressive résumé. He received his bachelor of science degree in molecular biophysics and biochemistry from Yale University. He received his masters of science and doctorate in biochemistry and his medical degree from New York University.

Ross is an associate clinical professor of medicine at George Washington University School of Medicine and Health Science and

14

Director of HIV, Hepatitis, and Related Conditions Program at the
Department of Veterans Affairs.

However, his previous employment is most germane to the current
motion. Ross spent ten years working at the FDA, where he spent much
of his time with the Center for Drug Evaluation and Research.

Ross opines as follows. First, the product labeling for the
MiniCaps did not provide adequate warnings about the potential risks
of peritonitis from missing or malpositioned sponges. Next, Baxter was
not compliant as to cGMPs and other applicable FDA standings,
including monitoring and responding to evidence of
manufacturing/design defects. Third, Baxter failed to construct,
validate, and implement design and manufacturing standards relating
to the depth of the sponge. Finally, Baxter's notification procedures and
its corrective actions with respect to design and/or manufacturing
defects in the subject MiniCaps were inadequate because of the lack of
timeliness, the potential increase in risk, and the size of the at-risk
population.

### 1.    Ross Is Not Qualified

The issue here is whether Ross is qualified to give these opinions in light of his work experience at the FDA but lack of experience working with medical devices. The Court holds that Ross is not qualified to give this particular testimony.

Ross has no experience with medical devices, which are governed by a specific section of the Food, Drug, and Cosmetic Act, which is implemented and enforced by the FDA's Center for Devices and Radiologic Health. Ross worked for the Center for Drug Evaluation and Research, not the Center for Devices. He acknowledges that he is not familiar with regulations that govern medical devices.

Mrs. Ghorley responds that Defendants improperly focus on Ross's experience with medical devices. Instead, she argues, "a witness can know about notification procedures and labeling without qualifying as a medical device design engineer." [68] at 8.

Mrs. Ghorley cites *Dolin v. Smithkline Beecham Corp.*, No. 12 C 6403, 2015 WL 7351678 (N.D. Ill. Nov. 20, 2015), to support her assertion that Ross's experience in drug regulation is transferable to

other areas. In that case, Ross was challenged as unsuited to offer a regulatory opinion regarding the psychotropic drug Paxil because he was not a psychiatrist. The court allowed Ross's testimony.

That case is distinguishable from this case. In *Dolin*, the plaintiff brought a claim against the defendant for failure to adequately warn of the risk of adult suicidality as a side of effect of taking Paxil. Ross testified that the Paxil label did not provide adequate warnings about the risk of suicidal behavior. The defendant sought to exclude Ross's testimony because he lacked the qualifications and expertise to opine on the adequacy of the labeling. Ross was allowed to testify about labeling and regulatory and compliance for a *drug*—something that fits within the ambit of his expertise in *pharmaceutical* regulation.

In this case, Ross is not testifying about *pharmaceutical* regulation; he is testifying about *medical device* regulation. Ross's time at the FDA has nothing to do with the regulation, label, or manufacture of medical devices. His time at the FDA working with pharmaceuticals does not make him an expert on labeling medical devices.

17

There is no doubt that Ross is qualified as a physician; however, this first prong of the *Daubert* analysis requires the Court to "examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314 (N.D. Ga. 2002). Ross is not an expert on medical devices or the regulation of those devices. He has never testified as an expert in a case involving a medical device, and he has minimal experience presenting and publishing on medical devices.

## 2.    Ross's Opinions Are Not Reliable

Moreover, Ross's testimony is unreliable. Defendants attack multiple aspects of Ross's testimony. First, they assert that Ross did not examine Baxter's manufacturing process, specifications, or quality control procedures and that his opinion is based on only the recall of the MiniCaps. Next, they assert that Ross relies on information that is not binding on device manufacturers. Finally, they argue that Ross cannot cite to facts, regulatory authority, testimony, or experience to support his conclusion that the labels were inadequate.

18

Mrs. Ghorley's response to Defendants' attack is lackluster. She argues that it does not matter that Ross did not review Baxter's manufacturing procedures, specifications, or quality control procedures because he is not offered as a manufacturing expert. Rather, she asserts that he is an expert in FDA regulatory processes. She also claims that it is proper for Ross to rely on reasonable assumptions to make his conclusions.

First, Ross's failure to review Baxter's manufacturing and quality control processes is fatal to Mrs. Ghorley's argument that his opinions are admissible. Ross cannot opine that Baxter failed to establish and maintain procedures to ensure that specified design requirements are met without reviewing those procedures. To the extent Ms. Ghorley argues that Ross could rely on assumptions, it is not clear which assumptions she refers to.

Next, Ross bases much of his testimony on the manual published by the Center for Drug Evaluation and Research, *not* the Center for Devices and Radiologic Health. It simply makes no sense for an expert

to base his opinions upon a document that does not apply to the product at issue.

Finally, Ross's opinion as to the MiniCap product label is conclusory. Ross does not identify any facts, regulatory authority, testimony, or experience to support his conclusion that the label was misbranded. Though Ross seems to have relied on his experience to form his opinion on the label, he does not explain how his experience leads to his conclusion.

Accordingly, the Court will exclude Ross's testimony.

**C.    J.P. Gingras**

Mrs. Ghorley retained J.P Gingras to opine on the economic loss resulting from her husband's death. Defendants assert that Gingras's calculation of lost Social Security benefits and household services is unreliable. Defendants also assert that Gingras's life expectancy calculator is misleading.

Mrs. Ghorley asserts that Defendants do not challenge Gingras's methods but his underlying assumptions. In particular, Mrs. Ghorley

points out that Defendants do not suggest that Gingras applied

incorrect formulas or that his calculation methodologies are faulty.

Defendants object to three distinct aspects of Gingras's opinion.

The Court will address each one in turn.

### 1. The Amount of Mr. Ghorley's Social Security Benefits Goes to the Weight of the Testimony

Defendants first assert that Gingras's opinion regarding Mr.

Ghorley's lost Social Security benefits is unreliable, misleading, and

unhelpful to the trier of fact. Specifically, Baxter argues that Gingras

calculated Mr. Ghorley's lost Social Security income based on a medical

record from the Atlanta Veterans Affairs Medical Center and did not

verify that Social Security income from any other document.

Mrs. Ghorley fails to explicitly address this argument other than

to say that Defendants challenge only Gingras's underlying assumption.

The documents upon which Gingras relies to calculate lost Social

Security income go to the weight of the evidence rather than the

admissibility. Defendants will have the opportunity at trial to cross-

examine Gingras and point out any perceived flaws in his calculations,

as well as to present contrary evidence to refute Gingras's testimony as

to the amount of Mr. Ghorley's Social Security income. Accordingly, the Court will allow this testimony.

### 2.   Mr. Ghorley's Contributions to the Household Go to the Weight of the Evidence

Baxter next argues that Gingras's opinions regarding the value of Mr. Ghorley's household services are unreliable, misleading, and unhelpful to the trier of fact. Specifically, Baxter claims that Gingras's opinion on loss of household services ignores the specific facts of this case, particularly that Mr. Ghorley did not perform any household duties after he began hemodialysis in 2012.

Again, Mrs. Ghorley responds by stating that Defendants attack only Gingras's underlying assumptions and that mortality tables are frequently used by accountants and economists to calculate the loss of household services.

In Gingras's deposition, he states that he calculated the loss of household services based on their replacement cost at an hourly rate. Before calculating that number, Gingras did not determine the actual contribution that Mr. Ghorley made prior to his death because "that's a question of fact." [66-16] at 28.

The Court agrees. Defendants' challenge to this aspect of Gingras's testimony goes to its credibility rather than its admissibility. Gingras uses assumptions to calculate the loss of economic services. But assumptions do not render methodology inadmissible. *See Berk-Cohen Assocs., LLC v. Orkin Exterminating Co.*, No. CIV.A. 94-3090, 2004 WL 445132, at *2 (E.D. La. Mar. 10, 2004).

### 3.  Gingras's Life Expectancy Opinion Is Inadmissible

Finally, Defendants assert that Gingras's life expectancy calculation is misleading and will not assist the trier of fact. Specifically, Defendants argue that Gingras's opinion is generic because he uses a general life expectancy table, the United States Life Tables. The U.S. Life Tables indicates the average life expectancy of all males in the United States and does not take into account Mr. Ghorley's serious health issues. Defendants assert that Gingras's use of the general life expectancy tables is particularly problematic because a different source—the United States Renal Data Service—publishes life expectancy tables that *do* address the lower life expectancy of an individual with renal disease.

23

Mrs. Ghorley responds that Gingras's assumptions are supported by the facts of this case. She argues that Gingras evaluates Mr. Ghorley's assumed life expectancy and that the United States Life Tables is a well-recognized, widely accepted source[5] used by professionals to develop reasonable assumptions of life expectancy.

Defendants cite *Rinker v. Carnival Corp.*, No. 09-23154-CIV, 2012 WL 37381, at *2 (S.D. Fla. Jan. 6, 2012), to support their assertions that Gingras's failure to take "medical issues into account when calculating life expectancy makes his opinion and calculations inaccurate and speculative." [76] at 9. In *Rinker*, the court excluded a life-care-planning expert's report as speculative because its life expectancy calculations were based upon on a healthy sixty-two-year-old woman instead of the plaintiff, who was a sixty-two-year-old woman *with cancer*. The court held that the expert was not reliable because all calculations were based on the life expectancy of a healthy woman. Accordingly, Defendants assert that Gingras cannot ignore Mr.

---

[5] The United States Life Tables is published by the National Office of Vital Statistics of the United State Department of Health and Human Services.

Ghorley's known conditions when making a damages calculation. The Court agrees. Mr. Ghorley suffered from many serious medical conditions, enough so that it cannot be said that his mortality could reasonably be expected to be the same as that of the "average" 67-year-old male.

Accordingly, the Court will exclude Gingras's testimony as to Mr. Ghorley's life expectancy. While Gingras may generally testify as to Mr. Ghorley's lost Social Security income and loss of household services, he may not multiply those annual amounts by the number of years Mr. Ghorley might have been expected to live.

## III.  Conclusion

For the foregoing reasons, Defendants' motion is granted as to Fishbach and Ross and granted in part but denied in part as to Gingras. The parties should submit their proposed pretrial order by October 7. This case will go trial before a jury on Monday, February 24, 2020.

IT IS SO ORDERED this 9th day of September, 2019.

Timothy C. Batten, Sr.
United States District Judge