# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

KAY GHORLEY, individually and as
administrator of the estate of Benjamin
Ghorley, deceased,

  Plaintiff,

v.

BAXTER HEALTHCARE
CORPORATION; BAXTER
INTERNATIONAL INC.; and DVA
HEALTHCARE RENAL INC. d/b/a
ROME DIALYSIS,

  Defendants.

Civil Action File
No. 1:17-CV-3091-TCB

---

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
## RECONSIDERATION OF CERTAIN *DAUBERT* RULINGS

Michael B. Terry
Jane D. Vincent
Solesse L. Altman
BONDURANT MIXSON & ELMORE, LLP

Darren W. Penn
Alexandra "Sachi" Cole
PENN LAW LLC

*Attorneys for Plaintiff Kay Ghorley*

# TABLE OF CONTENTS

I. J.P. Gingras, MBA ........................................................................2

    A. The Court's exclusion of the United States Life Tables is contrary to Supreme Court and Eleventh Circuit precedent and Georgia statute .........2

        1. Supreme Court of the United States Precedent ...............................2

        2. Eleventh Circuit Precedent ..............................................................3

        3. Georgia Law ....................................................................................5

    B. It is the role of the jury—not Mr. Gingras and not the Court—to determine Mr. Ghorley's life expectancy ....................................................6

II. Ronald Fishbach, M.D. ...................................................................8

    A. Dr. Fishbach's cause of death opinion is a distinct causation opinion that was not challenged by Defendants and was not properly considered by the Court ..........................................................................10

    B. Dr. Fishbach applied uncontroversial principles to conclude it was medically probable that defective MiniCaps caused Mr. Ghorley's two episodes of peritonitis ...................................................................12

        1. Dr. Fishbach reviewed Mr. Ghorley's medical history for pertinent risk factors ....................................................................14

        2. Dr. Fishbach considered other possible causes of the peritonitis ......................................................................................15

        3. A temporal relationship between exposure and illness, while not sufficient, is a necessary component to any causation opinion ....................................................................17

CONCLUSION ...................................................................................18

Plaintiff respectfully requests the Court reconsider its *Daubert* rulings excluding portions of J.P. Gingras's damages opinion and Dr. Ronald Fishbach's individual causation opinion.[1]

Standard life expectancy tables "shall" be admitted as evidence of damages in wrongful death cases under Georgia law. *See* O.C.G.A §§ 24-14-44; 24-14-45. And in federal court, "tables showing the probable duration of life…are competent evidence." *Vicksburg & M.R. Co. v. Putnam*, 118 U.S. 545, 554 (1886). Plaintiff's damages expert, J.P. Gingras, used a "well-recognized, widely accepted" life expectancy table[2] to calculate economic losses that would have accrued over the remaining lifetime of decedent Mr. Ghorley.[3] This Court's Order striking the part of Gingras's damages calculations based on this life expectancy table erroneously

---

[1] September 10, 2019 Order [Doc. 85] (hereinafter "Order").

[2] Order at 24 ("The United States Life Tables is published by the National Office of Vital Statistics of the United State[s] Department of Health and Human Services.").

[3] As a brief review: Plaintiff alleges Mr. Ghorley used defective MiniCaps—a medical device manufactured by the Baxter Defendants—in his home dialysis system. There is no dispute that Baxter manufactured and shipped defective lots of MiniCaps. There is also no dispute that Mr. Ghorley received and used around 60 MiniCaps from those adulterated lots. Despite having been on home dialysis without incident for more than a year, after receiving and using MiniCaps from these adulterated shipments Mr. Ghorley experienced two bouts of peritonitis within approximately two months, and ultimately died of complications from the second infection.

excluded clearly competent evidence and improperly usurped the fact-finding role of the jury.

District Courts also have a responsibility to consider all of an expert's testimony and data, and failure to do so is "manifest" error. *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 989 (11th Cir. 2016). This Court erroneously adopted Defendants' characterization of Dr. Fishbach's deposition without considering his full testimony. In doing so, the Court overlooked Dr. Fishbach's testimony that he considered a variety of risk factors for peritonitis, examined Mr. Ghorley's medical and social history, and considered other potential causes in forming his individual causation opinion.

Because these exclusions are reversible error, Plaintiff respectfully requests this Court reconsider its rulings and set a *Daubert* hearing.

## I. J.P. Gingras, MBA

### A. The Court's exclusion of the United States Life Tables is contrary to Supreme Court and Eleventh Circuit precedent and Georgia statute.

#### 1. Supreme Court of the United States Precedent

Excluding Gingras's "well-recognized, widely accepted"[4] "standard life…table[]" was error under long-established Supreme Court precedent. *Putnam*,

---

[4] Order at 24.

118 U.S. at 554 (1886). For nearly 150 years, it has been the rule in federal courts that "tables showing the probable duration of life…are competent evidence." *Id*. at 554. As the Supreme Court explained in *Putnam*, while such tables are relevant and admissible, they are, of course, not determinative: the trial judge should always "instruct[] the jury in general terms to award a fair and reasonable compensation, taking into consideration what the [decedent's] income would probably have been [and] how long it would have lasted." *Id*. at 555.

## 2. *Eleventh Circuit Precedent*

Even more factually on point is binding Eleventh Circuit precedent from the former Fifth Circuit. *Kershaw v. Sterling Drug, Inc.*, 415 F.2d 1009 (5th Cir. 1969). The rule in the Eleventh Circuit is that standard life expectancy tables are admissible as evidence of damages, even when "the [plaintiff] [is] not in good health." *Id*. at 1012. In *Kershaw*, the plaintiff sued over defective eye medication that caused permanent and substantial vision damage, and the defendant argued that the standard "mortality tables should not have been introduced because the [plaintiff] was not in good health." *Id*. Similarly, here Defendants argued that the

U.S. Life Tables used by Gingras are "generic" and "[do] not take into account any evidence regarding Mr. Ghorley's health issues."[5]

Unfortunately, this Court followed Defendants' flawed analysis (and relied on an unpublished, nonbinding Southern District of Florida case[6]), rather than the binding precedent of the Eleventh Circuit. The Court of Appeals in *Kershaw* rejected the defendant's argument and held that a general life expectancy table is "freely admissible," even when the plaintiff is not in good health. It further explained that the defendant was "free to argue that such tables are based on average life expectancies and the jury may consider any conditions of health which might cause appellee not to equal the average." *Kershaw*, 415 F.2d at 1012 (citing *Putnam*, 118 U.S. at 545).

Likewise, Defendants here are free to introduce their own evidence, including alternative life tables, but under *Kershaw*, it is error to exclude the "well-recognized, widely accepted"[7] U.S. Life Tables used by Gingras.

---

[5] Brief in Support of Defendants' Motion to Exclude Opinions of Plaintiff's Experts Dr. Ronald Fishbach, Dr. David Ross, and Mr. J.P. Gingras ("Defs.' Mot. to Exclude") [Doc. 66-1] at 24.

[6] *Rinker v. Carnival Corp.*, No 09-23154-CIV, 2012 WL 37381 (S.D. Fla. Jan. 6. 2012).

[7] Order at 24.

### 3. Georgia Law

The exclusion of the standard life table was also in contravention of Georgia law. The Georgia legislature has conclusively established the evidentiary admissibility of standard life expectancy tables for determining damages in wrongful death cases. O.C.G.A. §§ 24-14-44; 24-14-45.[8] Because standard mortality tables are—under Georgia and federal law—competent evidence of life expectancy for a jury to consider, it was an abuse of discretion for this Court to exclude Gingras's calculations based on such a chart. Indeed, any wrongful death valuation that did not consider this evidence would be incomplete—as any adjustments by the jury, up or down, based on individual facts in the case, must necessarily start with an established standard as a baseline.

To the extent there are other, potentially relevant, life expectancy tables that Defendants wish to introduce through their expert or cross examine Gingras with, they are free to do so.[9] But Gingras's calculations are based on a table that the

---

[8] These statutes identify several specific mortality tables (not used by Gingras), but also explicitly state that these identified tables "shall not be the exclusive method" but are "supplementary to other lawful…methods." The specific tables in the statues are generally not used today because they are older and systematically underestimate life expectancy (*i.e.,* Americans live longer today than they did in 1949).

[9] "Mortality tables, at their most generic level, will usually distinguish only between male and female life expectancy at a particular age. These tables can,

Georgia General Assembly, the Eleventh Circuit, and the Supreme Court of the United States have deemed competent evidence, and it was error to exclude them.

**B. It is the role of the jury—not Mr. Gingras and not the Court—to determine Mr. Ghorley's life expectancy.**

Gingras does not offer—and does not have—an opinion about Mr. Ghorley's life expectancy. It is for the fact-finder to decide how long Mr. Ghorley might have lived, but for the negligence of Defendants. In its Order striking the standard life tables, this Court invaded the role of the fact-finder: "Mr. Ghorley suffered from many serious medical conditions, enough so that it cannot be said that his mortality could reasonably be expected to be the same as that of the 'average' 67-year-old male."[10] With all due respect to the Court, that conclusion belongs to the jury.

This Court did not take issue with any other aspects of Gingras's expert opinions: his annual social security estimates are admissible, his household contribution calculations are admissible, and his future to present valuations are admissible. The only thing this Court said Gingras could not do was "multiply those annual amounts by the number of years Mr. Ghorley might have been

---

however, focus more granularly on numerous other distinctions that impact the life expectancy of a particular individual, such as race, income, geography, education, family history, medical history, and other factors." *United States v. Mathurin*, 868 F.3d 921, 932 (11th Cir. 2017).

[10] Order at 25.

1809731.1

expected to live."[11] But this ruling does not consider Gingras's full opinion. Gingras does not opine that Mr. Ghorley would have lived to be one particular age. Instead, his opinion starts with the assumption that Mr. Ghorley had the average life expectancy of an American male aged 67-68, and then Gingras calculated the economic value of each additional year Mr. Ghorley might have lived had he not died of complications from peritonitis at age 67. *See* Calculation of Lost Social Security Benefits Scenarios 1 and 2, attached hereto as Exhibits A and B.

Far from opining that Mr. Ghorley would have lived to be any particular age, Gingras used the U.S. Life Tables as a starting point and provides the jury with economic loss values for each year that Mr. Ghorley might have lived—from 68 to 95 years old. So, if the Defendants introduce a different life expectancy table for individuals with kidney disease, or smokers,[12] or motorcycle riders for that matter,[13] and the jury determines that Mr. Ghorley would have lived to some age

---

[11] *Id.*

[12] "Life expectancy for smokers is at least 10 years shorter than for nonsmokers." Centers For Disease Control and Prevention, "Tobacco-Related Mortality" (*available at* https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health _effects /tobacco_related_mortality/index.htm).

[13] "Death rates from motorcycle crashes have risen steadily since states began weakening helmet laws about a decade ago…Notably, nearly half of the riders killed in 2006 were age 40 and older, and nearly a quarter were older than 50." Tara Parker-Pope. "*A New Risk of Middle Age: Dying on a Motorcycle*," N.Y. Times (Apr. 10, 2008) (*available at*

other than the average male, Gingras's damages calculations allow the jury to award precisely that amount by simply selecting a different age of death on his chart. *See e.g.*, Exs. A and B. There is nothing about that that is speculative or unreliable.

It is the role of the jury as fact finder to determine Mr. Ghorley's actual life expectancy based on the evidence presented at trial. And this Court erred when it ruled—as a matter of law—that Mr. Ghorley would not have lived as long as the average 67 year old American male. Because of these errors, Plaintiff respectfully requests the Court reconsider its ruling and allow Gingras's calculations based on the U.S. Life Tables.

## II.     Ronald Fishbach. M.D.

Dr. Fishbach is a board-certified physician in internal medicine and infectious diseases. Dr. Fishbach is currently, and has been for twenty years, a professor of clinical medicine at the UCLA School of Medicine. Dr. Fishbach offered two causation opinions: (1) it was medically probable that Mr. Ghorley's episodes of peritonitis were caused by defective MiniCaps (cause of infection opinion) and (2) it was medically probable that Mr. Ghorley's death was the result

https://well.blogs.nytimes.com/2008/04/10/a-new-risk-of-middle-age-dying-on-a-motorcycle/).

of complications from the second bout of peritonitis (cause of death opinion). The Court erroneously excluded the first opinion without considering all the evidence from Dr. Fishbach. The Court erroneously excluded the second opinion without considering any evidence.

It is undisputed in this case that Baxter sold defectively manufactured MiniCaps which were ultimately subject to a Class 2 recall by the FDA and that Mr. Ghorley received multiple shipments from those defective lots.[14] It is also undisputed that using a defective MiniCap during peritoneal dialysis can cause an infection (known as peritonitis) because a separated or missing sponge "may compromise the ability of the MiniCap to provide a sterile barrier.…[which] may increase the risk of peritonitis."[15] Dr. Fishbach is clearly qualified to testify as to that general causation and the Court did not consider or rule on that causation opinion.[16]

---

[14] January 27, 2015 Urgent Product Recall Notice ("Recall Notice") [Doc. 1-2, Ex. C] (page 33 of file-stamped document).

[15] Order at 9; Recall Notice [Doc. 1-2, Ex. C] (page 33 of file-stamped document).

[16] The opinion that the MiniCaps caused Mr. Ghorley's specific cases of peritonitis is a two-step opinion: (1a) there must be a foundational opinion that defective MiniCaps *can* cause an infection (general causation) and (1b) that they *did* cause such an infection in Mr. Ghorley (individual causation). Defendants only challenged, and the Court only excluded the individual causation opinion.

Thus, the pertinent question, as framed by the Court, is whether Dr. Fishbach applied reliable principles and methods to reach his causation opinion. Because the Court erroneously held that Dr. Fishbach identified "*no* principles or methodology,"[17] the Court should reconsider its ruling on individual causation. The Court also failed to analyze Dr. Fishbach's cause of death opinion separate from the cause of infection opinion. Because they are different opinions—based on different evidence and different principles—the Court must analyze them separately.

## A. Dr. Fishbach's cause of death opinion is a distinct causation opinion that was not challenged by Defendants and was not properly considered by the Court.

Dr. Fishbach opined that Mr. Ghorley died of complications from his second bout of peritonitis. This is different from his opinion that the defective MiniCaps caused Mr. Ghorley's peritonitis. There is no dispute that Mr. Ghorley in fact had peritonitis in November 2014. Setting aside what caused the peritonitis in the first place, there is an open question as to whether Mr. Ghorley died of complications from the November infection, or whether he died in December of some condition wholly unrelated to the peritonitis episode.

---

[17] Order at 10 (emphasis in original).

Defendants did not even challenge Dr. Fishbach's cause of death causation opinion in their *Daubert* motion.[18] And this Court's Order only analyzed whether Dr. Fishbach applied reliable principles and methodology to his cause of peritonitis opinion: "More important is whether Fishbach's opinion that the defective MiniCaps caused Mr. Ghorley's peritonitis is reliable. It is not."[19]

Yet, without any analysis of the opinion or deposition testimony, the Court also excluded the cause of death opinion, stating that Dr. Fishbach "failed to consider any other causes of Mr. Ghorley's subsequent death." But this was not an argument advanced by Defendants and it is not an argument supported by any evidence. In so concluding, the Court erroneously interjected its own opinions about the significance of Mr. Ghorley's discharge status and death certificate.[20] There are plenty of reasons why one infection could be resolved, yet that infection or its treatment compromises other bodily systems and sets off a chain reaction in

---

[18] *See generally* Defs.' Mot. to Exclude at 10–15. To the extent Defendants mention a cause of death opinion at all, it is always combined with the cause-of-peritonitis opinion and Defendants' critique of that methodology.

[19] Order at 10.

[20] *Id*. at 13.

the body, eventually resulting in the patient's death. This is common etiology for many illnesses and death.[21]

Defendants did not find it necessary to question Dr. Fishbach about the basis for his cause of death opinion, and this Court should not have *sua sponte* decided the methodology was unreliable—especially without the benefit any testimony on his methodology and having denied Plaintiff an opportunity for a *Daubert* hearing.

**B. Dr. Fishbach applied uncontroversial principles to conclude it was medically probable that defective MiniCaps caused Mr. Ghorley's two episodes of peritonitis.**

The Defendants argued, and this Court believed, that Dr. Fishbach relied solely on a temporal relationship. As an initial matter, a temporal relationship is necessary, even when it is not sufficient, to infer causation: "A temporal, or chronological, relationship must exist for causation to exist. If an exposure causes disease, the exposure must occur before the disease develops."[22]

---

[21] For example, "pneumonia" on a death certificate does not tell whether the person contracted the flu or legionnaire's disease. *See* https://www.cdc.gov/pneumonia/causes.html. Similarly, "sudden cardiac arrest" on a death certificate may make people think of a heart attack, but in fact, most sudden cardiac deaths are caused by a condition called ventricular fibrillation. *See* https://my.clevelandclinic.org/health/diseases/17522-sudden-cardiac-death-sudden-cardiac-arrest.

[22] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 601 (hereinafter "Reference Manual"). This reference manual is published by the Federal Judicial Center to "assist judges in managing cases involving complex scientific and technical

But more broadly, it is the responsibility of district courts to consider all of the expert's testimony and data, and failure to do so is "manifest" error. *Seamon*, 813 F.3d at 989. Contrary to Defendants' assertion that Dr. Fishbach relied solely on a temporal association, he actually formed his opinion by "applying an established body of medical knowledge and drawing on h[is] extensive experience in the field." *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1330 (11th Cir. 2014).

Unfortunately, by focusing solely on temporality the Court overlooked a number of other factors applicable and considered by Dr. Fishbach. Physicians rely on a variety of evidence to support an individual causal inference, including: presence or absence of risk factors, biological plausibility, case reports, and temporal proximity.[23]

There is no missing methodology to Dr. Fishbach's infectious disease opinion. While he did not use magic "methodology" words when describing his analysis, that does not mean the Court can dismiss his testimony. Indeed, his causation methodology is not complicated or controversial: he reviewed the patient's relevant medical and social history to ascertain potential sources of

___

evidence by describing the basic tenets of key scientific fields from which legal evidence is typically derived and by providing examples of cases in which that evidence has been used." (*available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf).

[23] REFERENCE MANUAL at 714.

exposure to microorganisms, and then applied his training and experience to determine infection risks associated with peritoneal dialysis and potential causes of peritonitis in dialysis patients.[24] He also examined Mr. Ghorley's specific medical records to determine if the patient had "preexisting illnesses that would weaken him and make him more susceptible to infection," and whether alternative sources could reasonably be responsible for the infection.[25] Dr. Fishbach's methodology "appl[ied] an established body of knowledge" in infectious diseases to information in Mr. Ghorley's medical records—under these facts, *Daubert* does not require more. *Adams*, 760 F.3d at 1330.

### 1. Dr. Fishbach reviewed Mr. Ghorley's medical history for pertinent risk factors.

Dr. Fishbach testified that he looked for any issue in the medical history that would make Mr. Ghorley "more susceptible to infection."[26] Based on review of the medical history, Dr. Fishbach testified that Mr. Ghorley had several conditions that would affect how he responded to an infection, but that would not directly contribute to developing the infection in the first instance: peripheral vascular disease, hypertension, and COPD, among others. Dr. Fishbach also considered and

---

[24] Deposition of Ronald Fishbach ("Fishbach Dep.") [Doc 66-10] at 61:24–63:23.

[25] *Id.*; *Id.* at 58:6–59:25.

[26] *Id.* at 58:20–25.

testified about medical issues and/or conditions that would actively contribute to developing peritonitis, specifically for patients undergoing peritoneal dialysis, chief among them "contamination of the system or technique" that would allow "microorganisms…to get into the peritoneal cavity."[27]

### 2. Dr. Fishbach considered other possible causes of the peritonitis.

This Court excluded Dr. Fishbach's opinion because "Fishbach's failure to consider alternative causes of Mr. Ghorley's peritonitis makes his testimony unreliable."[28] But the deposition testimony is clear that Dr. Fishbach did consider multiple other causes of the peritonitis—and he ruled them out.

Particularly disingenuous is Defendants' argument to the Court that Dr. Fishbach failed to "analy[ze]…contamination due to improper technique."[29] First, Dr. Fishbach explicitly testified that he reviewed and considered the notes in Mr. Ghorley's chart about technique.[30] But just as important, Defendants failed to tell the Court that an increased risk of non-aseptic technique by the patient is a specifically identified "hazard" in the MiniCap recall notice: "Use of MiniCaps with sponges partially protruding from the caps may encourage non-aseptic

---

[27] *Id*. at 63:4–23.

[28] Order at 13.

[29] Defs.' Mot. to Exclude at 3.

[30] Fishbach Dep. at 71:8–15.

1809731.1

techniques, such as inadvertently touching the sponge to reposition it inside the cap. This may increase the risk of peritonitis."[31]

As an infectious disease specialist, Dr. Fishbach also identified and considered other causes that were specific to the etiology of peritonitis. Among those he discussed in his deposition were bacteria that develop in the body from the gastrointestinal tract and enter the peritoneal cavity, as well as the spread of an infection from other areas of the body via the bloodstream.[32] But Mr. Ghorley's medical records do not indicate any of these issues were present at the time of either peritonitis episode.

Dr. Fishbach further testified that certain diseases "could allow bacteria to get into or fungae to get into the peritoneal cavity and cause peritonitis."[33] In particular, Dr. Fishbach identified "diverticulitis, biliary tract disease or ischemic bowel" as such conditions, and again, there is no medical evidence Mr. Ghorley had any of these conditions.[34] Mr. Ghorley's medical records did include October 27 discharge instructions consistent with a urinary tract infection and a diagnosis of malnutrition during Mr. Ghorley's first hospital admission. Dr. Fishbach

---

[31] Recall Notice [Doc 1-2, Ex. C].

[32] Fishbach Dep. at 63:10–17.

[33] *Id*. at 63:19–23.

[34] *Id*.

1809731.1

considered both of these conditions. He opined that the urinary tract infection noted in the chart on October 27 was most likely symptoms of early stage peritonitis that were misdiagnosed as a UTI.[35] As to the malnutrition diagnosis, Dr. Fishbach testified that it was unclear whether the malnutrition existed prior to the infection or if it was caused by the infection.[36]

Combined with available data about adverse events and Mr. Ghorley's use of MiniCaps packaged from these defective lots, Dr. Fishbach was able to opine that it is medically probably that Mr. Ghorley's late 2014 episodes of peritonitis were caused by defective MiniCaps. The gatekeeping function of *Daubert* does not require more.

### 3. A temporal relationship between exposure and illness, while not sufficient, is a necessary component to any causation opinion.

Again, Defendants mischaracterized Dr. Fishbach's testimony and erroneously convinced the Court that Dr. Fishbach's opinion was "[b]ased on nothing more than assumptions combined with a temporal relationship."[37] While Dr. Fishbach's choice of words in his report are less than ideal, in light of his more extensive deposition testimony, it does not disqualify his opinion. *Seamon*, 813

---

[35] *Id*. at 89:19–90:3.

[36] *Id*. at 64:8–17.

[37] Defs.' Mot. to Exclude at 10–11.

F.3d at 989 (district courts must consider the entire testimony and evidence). Indeed, a temporal relationship is necessary in any causation opinion and Dr. Fishbach's reliance on that data is not error. *McClain v. Metabolife Int'l., Inc.,* 401 F.3d 1233, 1243 (11th Cir. 2005) ("[T]he chronological relationship between exposure and effect must be biologically plausible."). Clearly a causal relationship is not established solely by a temporal relationship, but Dr. Fishbach did not rely solely on the temporal relationship. As discussed above, Dr. Fishbach applied common infectious disease principles to Mr. Ghorley's medical records in order to explain how a defective MiniCap would have permitted such infections and why Mr. Ghorley's bouts of peritonitis were unlikely to be caused by other sources of infection.

The proper rebuttal to Dr. Fishbach's individual causation opinion is not excluding it entirely under *Daubert*; it is to conduct a rigorous cross-examination. Defendants are free question Dr. Fishbach about his methods in front of a jury—but it is not so unreliable that a jury should never hear it.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court reconsider its rulings excluding Dr. Fishbach's testimony and portions of Mr. Gingras's testimony and set a *Daubert* evidentiary hearing.

Respectfully submitted this 8th day of October,

/s/ Jane D. Vincent
Michael B. Terry
Ga. Bar No. 702582
Jane D. Vincent
Ga. Bar No. 380850
Solesse L. Altman
Ga. Bar No. 442827
BONDURANT MIXSON & ELMORE, LLP
1201 W. Peachtree Street NW
Suite 3900
Atlanta, GA 30309

Darren W. Penn
Ga. Bar No. 571322
Alexandra "Sachi" Cole
Ga. Bar No. 696892
PENN LAW LLC
4200 Northside Pkwy, NW, Building
One, Suite 100
Atlanta, GA 30327

*Attorneys for Plaintiff Kay Ghorley*

## <u>CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 5.1C</u>

Pursuant to the Local Rules of the Northern District of Georgia, the above-signed counsel certifies that this pleading complies with all formatting requirements of the Local Rules and further certifies that this pleading is printed in Times New Roman, 14-point type.

*/s/ Jane D. Vincent*
Jane D. Vincent
Ga. Bar No. 380850

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 8, 2019, I electronically filed this **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF CERTAIN *DAUBERT* RULINGS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

S Suneel C. Gupta
J. Carter Thompson, Jr.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKWOTIZ, P.C.
Monarch Plaza, Suite 1600
3414 Peachtree Road NE
Atlanta, GA 30326
sgupta@bakerdonelson.com
cthompson@bakerdonelson.com

Wendy West Feinstein (Admitted Pro Hac Vice)
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA 15219-6401
wendy.feinstein@morganlewis.com

J. Carter Thompson, Jr. (Admitted Pro Hac Vice)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKWOTIZ, P.C.
One Eastover Center
100 Vision Drive, Suite 400
Jackson, MS 39211
cthompson@bakerdonelson.com

*/s/ Jane D. Vincent*
Jane D. Vincent
Ga. Bar No. 380850

EXHIBIT

A

MR. BENJAMIN GHORLEY

**CALCULATION OF LOST SOCIAL SECURITY BENEFITS - Scenario # 1**
**DATE OF CALCULATION - AUGUST 1, 2018**

<span style="color:red">**Lost Social Security Benefits - Scenario # 1**</span>

| PV Years | Period | | | Age at Period End | Lost SS Benefits For Period (Note 1) | Discount Rate (Note 2) | Lost SS Benefits Present Value | Assumed Monthly SS Payment | Assumed Payment Year | Assumed Payment Increase | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02/01/15 | - | 12/31/15 | 68.58 | $ 13,618 | | $ 13,618 | $ 1,238 | *2015* | | $ 13,618 |
| | 01/01/16 | - | 12/31/16 | 69.58 | 15,109 | | 15,109 | 1,259 | *2016* | 1.7% | 28,727 |
| | 01/01/17 | - | 12/31/17 | 70.58 | 15,365 | | 15,365 | 1,280 | *2017* | 1.7% | 44,092 |
| | 01/01/18 | - | 12/31/18 | 71.58 | 15,627 | | 15,627 | 1,302 | *2018* | 1.7% | 59,719 |
| 0.9 | 01/01/19 | - | 12/31/19 | 72.58 | 15,892 | 3.00% | 15,467 | 1,324 | *2019* | 1.7% | 75,186 |
| 1.9 | 01/01/20 | - | 12/31/20 | 73.58 | 16,162 | 3.00% | 15,272 | 1,347 | *2020* | 1.7% | 90,458 |
| 2.9 | 01/01/21 | - | 12/31/21 | 74.58 | 16,437 | 3.00% | 15,079 | 1,370 | *2021* | 1.7% | 105,538 |
| 3.9 | 01/01/22 | - | 12/31/22 | 75.58 | 16,717 | 3.00% | 14,889 | 1,393 | *2022* | 1.7% | 120,427 |
| 4.9 | 01/01/23 | - | 12/31/23 | 76.58 | 17,001 | 3.00% | 14,701 | 1,417 | *2023* | 1.7% | 135,128 |
| 5.9 | 01/01/24 | - | 12/31/24 | 77.58 | 17,290 | 3.00% | 14,516 | 1,441 | *2024* | 1.7% | 149,644 |
| 6.9 | 01/01/25 | - | 12/31/25 | 78.58 | 17,584 | 3.00% | 14,332 | 1,465 | *2025* | 1.7% | 163,976 |
| 7.9 | 01/01/26 | - | 12/31/26 | 79.58 | 17,883 | 3.00% | 14,152 | 1,490 | *2026* | 1.7% | 178,128 |
| 8.9 | 01/01/27 | - | 12/31/27 | 80.58 | 18,187 | 3.00% | 13,973 | 1,516 | *2027* | 1.7% | 192,101 |
| 9.9 | 01/01/28 | - | 12/31/28 | 81.58 | 18,496 | 3.00% | 13,797 | 1,541 | *2028* | 1.7% | 205,897 |
| 10.9 | 01/01/29 | - | 12/31/29 | 82.58 | 18,810 | 3.00% | 13,622 | 1,568 | *2029* | 1.7% | 219,520 |
| 11.9 | 01/01/30 | - | 12/31/30 | 83.58 | 19,130 | 3.00% | 13,451 | 1,594 | *2030* | 1.7% | 232,970 |
| 12.5 | 01/01/31 | - | 07/20/31 | 84.13 | 11,349 | 3.00% | 7,850 | 1,621 | *2031* | 1.7% | 240,820 |

Undiscounted Lost SS Benefits - Scenario # 1    $ 280,656

Present Value of Lost SS Benefits - Scenario # 1    $ 240,820

**Note 1**

For the purpose of scenario # 1, the main assumptions are that Mr. Ghorley would have lived, "but for" his untimely death, to age 84.13 years old and that the COLA adjustment to the Social Security ("SS") benefits would have been 1.7% per year on average post calendar year 2015. This scenario is extremely conservative as it assumes that Mr. Ghorley would have received monthly payments of $1,238 per month when it appears that Mr. Ghorley was receiving this amount during calendar year 2012. It would be reasonable to believe that Mr. Ghorley's SS payments were affected by COLA for 2012, 2013 and 2014 (*i.e.*, affecting the 2013, 2014 and 2015 SS payments). Assuming that Mr. Ghorley's payments were affected by COLA for these years, Mr. Ghorley's assumed SS payment would have amounted to $1,259 per month for calendar year 2013 (*i.e.*, $1,238 * (1 + 1.7%) = $1,259), $1,278 per month for calendar year 2014 (*i.e.*, $1,259 * (1 + 1.5%) = $1,278) and $1,300 per month for calendar year 2015 (*i.e.*, $1,278 * (1 + 1.7%) = $1,300). Assuming that $1,300 per month was being paid to Mr. Ghorley in 2015, the economic damages or losses calculated in this scenario would have amounted to $252,881.

The assumption for Mr. Ghorley's "but for" approximate life expectancy date was obtained using the National Vital Statistics Reports issued by the U.S. Department of Health and Human Services, United States Life Tables, 2014, Volume 66, Number 4 (August 2017). Mr. Ghorley's life expectancy of 84.13 years old (*i.e.*, 67.53 years old + 16.60 years = 84.13 years old) was determined from Table 2, Life table for males: United States 2014 "as of" the date of injury (*i.e.*, December 11, 2014) or for males age 67 to 68 years old (*i.e.*, Mr. Ghorley was 67.53 years old as of the date of injury). Note that utilizing the average life expectancy per the actuarial table for calculating economic damages provides a level of certainty of 50% (*i.e.*, using 84.13 years old as Mr. Ghorley's assumed life expectancy provides of level of assurance of 50% that the calculations related to Mr. Ghorley's economic damages are not understated and achieves the stated goal of capturing 100% of Mr. Ghorley's economic damages or losses associated to the loss of his Social Security benefits for the rest of his life).

In addition, Mr. Ghorley's assumed estimated life expectancy of 84.13 years old is conservative as the date of injury is used as a static date to estimate his life expectancy. As of the date of this calculation, Mr. Ghorley would have been 71.16 years old yielding an estimated remaining life expectancy at 50% certainty of 13.80 years for a total estimated life expectancy of 84.96 years old (*i.e.*, 71.16 years old + 13.80 years = 84.96 years old) supporting the assertion that the economic damages calculations are conservative and that the life expectancy concept is not a "static" in nature.

The assumption for the COLA adjustment of 1.7% per year was calculated based on the last 10 years' average which is approximately the same period projected by these calculations. It is my opinion that the calculations presented are conservative and reasonable.

Note that the calculations presented were prepared following the guidance of the American Institute of Certified Public Accountants ("AICPA") Consulting Services' Practice Aid 98-2, *Calculation of Damages from Personal Injury, Wrongful Death, and Employment Discrimination*, the guidance of AICPA's Forensic & Valuation Services' Practice Aid, *Measuring Damages Involving Individuals*, the guidance of AICPA's Forensic & Valuation Services' Practice Aid, *Attaining Reasonable Certainty in Economic Damages Calculations*, the guidance of Statement on Standards for Consulting Services (SSCS) No. 1 as well as the AICPA Code of Professional Conduct.

This methodology is relied upon by experts in accounting to estimate the economic damages related to lost SS benefits within a reasonable degree of economic certainty and/or probability. See Exhibits # 3, # 4, # 5, # 6, # 8 and # 9 as well as Schedules 3, 4 and 5 for more details.

**Note 2**

O.C.G.A. 51-12-13 (2012) states "in determining the present value of future medical expenses, living expenses, *lost wages* or other economic damages, *the Trier of Fact may reduce the same to the present value based on a discount rate of 5 percent or any other discount rate as the trier of fact deems appropriate* [emphasis added]."

For the purpose of this calculation, it is common practice in the industry to utilize the risk free rate or Treasury Bond ("T-Bond") yield as the appropriate present value discount rate. As of the date of this calculation or August 1, 2018 the interest rate for T-Bonds ranged from 1.93% to 3.00% for the one month and 10-year notes, respectively. For conservatism purposes and as this calculation utilizes the long-term inflation rate, this calculation utilizes 3.00% as the present value discount rate since the calculation projects almost 13 years in the future but less than 20 or 30 years and since the assumed discount rate (*i.e.*, interest rate) does not take into account that some of the interest earned would or could be taxable to Mr. Ghorley. It is my expert opinion that this rate is appropriate, reasonable and is conservative as lower discount rates could be utilized for different periods which would increase the economic damages or losses.

Conversely, assuming a 5% discount rate would be unreasonable as this rate is an arbitrary and/or hypothetical rate and an interest rate that is risk-free of 5% is unavailable in the marketplace at this point in time.

Specifically, AICPA Practice Aid 98-2, paragraph 33 states that "Generally, the discount rate represents the rate at which the claimant or the survivors can invest the lump sum with no risk of loss. Interest-bearing U.S. government securities may be selected for this purpose. U.S. government bills have a term of one year or less (short-term securities); U.S. government notes have terms from one year to ten years (intermediate-term securities); and U.S. government bonds have maturities from ten years to thirty years (long-term securities). The period of loss may be used as the measure to select the security term, although some studies support the use of short-term securities regardless of the period of loss." However, the separate assessment of a discount rate for each period would be cumbersome and ineffective and would increase the economic damages estimated by this calculation.

Using a present value discount rate of 5%, as mentioned in the Statute, the present value of Mr. Ghorley's lost SS benefits would have been calculated as amounting to $219,818. However, utilizing the rate of "short-term securities regardless of the period of loss" as advocated in Practice Aid 98-2 or 1.93%, the present value of Mr. Ghorley's lost SS benefits would have been calculated as amounting to $253,747.

See Exhibits # 3 and # 7 for more details.

EXHIBIT

B

**MR. BENJAMIN GHORLEY**

**CALCULATION OF LOST SOCIAL SECURITY BENEFITS - Scenario # 2**
**DATE OF CALCULATION - AUGUST 1, 2018**

**Lost Social Security Benefits - Scenario # 2**

| PV Years | Period | | | Age at Period End | Lost SS Benefits For Period (Note 1) | Discount Rate (Note 2) | Lost SS Benefits Present Value | Assumed Monthly SS Payment | Assumed Payment Year | Assumed Payment Increase | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02/01/15 | - | 12/31/15 | 68.58 | $ 13,618 | | $ 13,618 | $ 1,238 | *2015* | | $ 13,618 |
| | 01/01/16 | - | 12/31/16 | 69.58 | 15,421 | | 15,421 | 1,285 | *2016* | 3.8% | 29,039 |
| | 01/01/17 | - | 12/31/17 | 70.58 | 16,007 | | 16,007 | 1,334 | *2017* | 3.8% | 45,045 |
| | 01/01/18 | - | 12/31/18 | 71.58 | 16,615 | | 16,615 | 1,385 | *2018* | 3.8% | 61,660 |
| 0.9 | 01/01/19 | - | 12/31/19 | 72.58 | 17,246 | 3.07% | 16,775 | 1,437 | *2019* | 3.8% | 78,434 |
| 1.9 | 01/01/20 | - | 12/31/20 | 73.58 | 17,901 | 3.07% | 16,893 | 1,492 | *2020* | 3.8% | 95,328 |
| 2.9 | 01/01/21 | - | 12/31/21 | 74.58 | 18,582 | 3.07% | 17,013 | 1,548 | *2021* | 3.8% | 112,341 |
| 3.9 | 01/01/22 | - | 12/31/22 | 75.58 | 19,288 | 3.07% | 17,134 | 1,607 | *2022* | 3.8% | 129,475 |
| 4.9 | 01/01/23 | - | 12/31/23 | 76.58 | 20,021 | 3.07% | 17,255 | 1,668 | *2023* | 3.8% | 146,730 |
| 5.9 | 01/01/24 | - | 12/31/24 | 77.58 | 20,782 | 3.07% | 17,377 | 1,732 | *2024* | 3.8% | 164,107 |
| 6.9 | 01/01/25 | - | 12/31/25 | 78.58 | 21,571 | 3.07% | 17,500 | 1,798 | *2025* | 3.8% | 181,607 |
| 7.9 | 01/01/26 | - | 12/31/26 | 79.58 | 22,391 | 3.07% | 17,624 | 1,866 | *2026* | 3.8% | 199,231 |
| 8.9 | 01/01/27 | - | 12/31/27 | 80.58 | 23,242 | 3.07% | 17,749 | 1,937 | *2027* | 3.8% | 216,980 |
| 9.9 | 01/01/28 | - | 12/31/28 | 81.58 | 24,125 | 3.07% | 17,875 | 2,010 | *2028* | 3.8% | 234,855 |
| 10.9 | 01/01/29 | - | 12/31/29 | 82.58 | 25,042 | 3.07% | 18,001 | 2,087 | *2029* | 3.8% | 252,856 |
| 11.9 | 01/01/30 | - | 12/31/30 | 83.58 | 25,993 | 3.07% | 18,129 | 2,166 | *2030* | 3.8% | 270,985 |
| 12.9 | 01/01/31 | - | 12/31/31 | 84.58 | 26,981 | 3.07% | 18,257 | 2,248 | *2031* | 3.8% | 289,242 |
| 13.9 | 01/01/32 | - | 12/31/32 | 85.58 | 28,006 | 3.07% | 18,387 | 2,334 | *2032* | 3.8% | 307,629 |
| 14.9 | 01/01/33 | - | 12/31/33 | 86.58 | 29,071 | 3.07% | 18,517 | 2,423 | *2033* | 3.8% | 326,145 |
| 15.9 | 01/01/34 | - | 12/31/34 | 87.58 | 30,175 | 3.07% | 18,648 | 2,515 | *2034* | 3.8% | 344,793 |
| 16.9 | 01/01/35 | - | 12/31/35 | 88.58 | 31,322 | 3.07% | 18,780 | 2,610 | *2035* | 3.8% | 363,573 |
| 17.9 | 01/01/36 | - | 12/31/36 | 89.58 | 32,512 | 3.07% | 18,913 | 2,709 | *2036* | 3.8% | 382,486 |
| 18.9 | 01/01/37 | - | 12/31/37 | 90.58 | 33,748 | 3.07% | 19,047 | 2,812 | *2037* | 3.8% | 401,533 |
| 19.9 | 01/01/38 | - | 12/31/38 | 91.58 | 35,030 | 3.07% | 19,182 | 2,919 | *2038* | 3.8% | 420,715 |
| 20.9 | 01/01/39 | - | 12/31/39 | 92.58 | 36,361 | 3.07% | 19,318 | 3,030 | *2039* | 3.8% | 440,033 |
| 21.9 | 01/01/40 | - | 12/31/40 | 93.58 | 37,743 | 3.07% | 19,454 | 3,145 | *2040* | 3.8% | 459,487 |
| 22.9 | 01/01/41 | - | 12/31/41 | 94.58 | 39,177 | 3.07% | 19,592 | 3,265 | *2041* | 3.8% | 479,079 |
| 23.9 | 01/01/42 | - | 12/31/42 | 95.58 | 40,666 | 3.07% | 19,731 | 3,389 | *2042* | 3.8% | 498,810 |
| 24.3 | 01/01/43 | - | 05/08/43 | 95.93 | 14,070 | 3.07% | 6,755 | 3,518 | *2043* | 3.8% | 505,565 |

Undiscounted Lost SS Benefits - Scenario # 2  $ 732,706

Present Value of Lost SS Benefits - Scenario # 2  $ 505,565

**Note 1**

For the purpose of scenario # 1, the main assumptions are that Mr. Ghorley would have lived, "but for" his untimely death, to age 95.93 years old and that the COLA adjustment to the Social Security ("SS") benefits would have been 3.8% per year on average post calendar year 2015. This scenario is conservative as it assumes that Mr. Ghorley would have received monthly payments of $1,238 per month when it appears that Mr. Ghorley was receiving this amount during calendar year 2012. It would be reasonable to believe that Mr. Ghorley's SS payments were affected by COLA for 2012, 2013 and 2014 (*i.e.*, affecting the 2013, 2014 and 2015 SS payments). Assuming that Mr. Ghorley's assumed SS payment would have amounted to $1,259 per month for calendar year 2013 (*i.e.*, $1,238 * (1 + 1.7%) = $1,259), $1,278 per month for calendar year 2014 (*i.e.*, $1,259 * (1 + 1.5%) = $1,278) and $1,300 per month for calendar year 2015 (*i.e.*, $1,278 * (1 + 1.7%) = $1,300). Assuming that $1,300 per month was being paid to Mr. Ghorley in 2015, the economic damages or losses calculated in this scenario would have amounted to $530,884.

The assumption for Mr. Ghorley's "but for" approximate total life expectancy date was obtained using the National Vital Statistics Reports issued by the U.S. Department of Health and Human Services, United States Life Tables, 2014, Volume 66, Number 4 (August 2017). The life expectancy was determined from Table 2, Life table for males: United States 2014 and provides a level of certainty of 95% (*i.e.*, using 95.93 years old as Mr. Ghorley's assumed life expectancy provides of level of assurance of 95% that the calculations related to Mr. Ghorley's economic damages are not understated and achieves the stated goal of capturing 100% of Mr. Ghorley's economic damages or losses associated to the loss of his Social Security benefits for the rest of his life).

The assumption for the COLA adjustment of 3.8% per year was calculated based on the last 43 years' average which is longer than the period used in projecting by these calculations but is reasonable based on current economic conditions.

It is my opinion that the calculations presented are conservative and reasonable.

Note that the calculations presented were prepared following the guidance of the American Institute of Certified Public Accountants ("AICPA") Consulting Services' Practice Aid 98-2, *Calculation of Damages from Personal Injury, Wrongful Death, and Employment Discrimination*, the guidance of AICPA's Forensic & Valuation Services' Practice Aid, *Measuring Damages Involving Individuals*, the guidance of AICPA's Forensic & Valuation Services' Practice Aid, *Attaining Reasonable Certainty in Economic Damages Calculations*, the guidance of Statement on Standards for Consulting Services (SSCS) No. 1 as well as the AICPA Code of Professional Conduct.

This methodology is relied upon by experts in accounting to estimate the economic damages related to lost SS benefits within a reasonable degree of economic certainty and/or probability.

See Exhibits # 3, # 4, # 5, # 6, # 8 and # 9 as well as Schedules 3, 4 and 5 for more details.

**Note 2**

O.C.G.A. 51-12-13 (2012) states "in determining the present value of future medical expenses, living expenses, *lost wages* or other economic damages, *the Trier of Fact may reduce the same to the present value based on a discount rate of 5 percent or any other discount rate as the trier of fact deems appropriate* [emphasis added]."

For the purpose of this calculation, it is common practice in the industry to utilize the risk free rate or Treasury Bond ("T-Bond") yield rate as the appropriate present value discount rate. As of the date of this calculation or August 1, 2018 the interest rate for T-Bonds ranged from 1.93% to 3.07% for the one month and 20-year notes, respectively. For conservatism purposes and as this calculation utilizes the long-term inflation rate, this calculation utilizes 3.07% as the present value discount rate since the calculation projects more than 20 years in the future but less than 30 years and since the assumed discount rate (*i.e.*, interest rate) does not take into account that some of the interest earned would or could be taxable to Mr. Ghorley. It is my expert opinion that this rate is appropriate, reasonable and is conservative as lower discount rates could be utilized for different periods which would increase the economic damages or losses.

Conversely, assuming a 5% discount rate would be unreasonable as this rate is an arbitrary and/or hypothetical rate and an interest rate that is risk-free of 5% is unavailable in the marketplace at this point in time.

Specifically, AICPA Practice Aid 98-2, paragraph 33 states that "Generally, the discount rate represents the rate at which the claimant or the survivors can invest the lump sum with no risk of loss. Interest-bearing U.S. government securities may be selected for this purpose. U.S. government bills have a term of one year or less (short-term securities); U.S. government notes have terms from one year to ten years (intermediate-term securities); and U.S. government bonds have maturities from ten years to thirty years (long-term securities). The period of loss may be used as the measure to select the security term, although some studies support the use of short-term securities regardless of the period of loss." However, the separate assessment of a discount rate for each period would be cumbersome and ineffective and would increase the economic damages estimated by this calculation.

Using a present value discount rate of 5%, as mentioned in the Statute, the present value of Mr. Ghorley's lost SS benefits would have been calculated as amounting to $413,858.

However, utilizing the rate of "short-term securities regardless of the period of loss" as advocated in Practice Aid 98-2 or 1.93%, the present value of Mr. Ghorley's lost SS benefits would have been calculated as amounting to $575,776.

See Exhibits # 3 and # 7 for more details.